Keith A. Jacoby, Bar No. 150233
kjacoby@littler.com
LITTLER MENDELSON, P.C.
2049 Century Park East, 5th Floor
Los Angeles, California 90067.3107
Telephone: 310.553.0308
Facsimile: 800.715.1330

Gwin Duangnapa, Bar No. 359350
gduangnapa@littler.com
LITTLER MENDELSON, P.C.
633 West 5th Street, 63rd Floor
Los Angeles, California 90071
Telephone: 213.443.4300
Facsimile: 800.715.1330

Attorneys for Defendant
HIREART, INC.

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CHARLES WALLACE, formerly known as CHARLES LEE ATCHISON,

Plaintiffs,

v.

SCALE AI, INC., a Delaware corporation; HIREART, INC., a Delaware corporation; and DOES 1 through 20, inclusive,

Defendants.

Case No. 3:26-cv-12797-AGT

**DECLARATION OF MARIELLE WARDELL IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS**

**Date:** **December 11, 2026**
**Time:** **10:00 AM**
**Judge:** **ALEX G. TSE**
**Dept.:** **CRTRM A – 15TH FLR**

Trial Date: None Set
Notice of Removal Filed: October 29, 2026
SFSC Complaint Filed: August 31, 2026

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

# DECLARATION OF MARIELLE WARDELL

I, Marielle Wardell, declare as follows:

1. I am the Head of Human Resources for Defendant HireArt, Inc. ("HireArt") and make this declaration in support of its Motion to Compel Arbitration and Stay Proceedings in the above captioned matter. I have personal knowledge of the facts set forth herein or have knowledge based on my review of HireArt, Inc.'s records made and maintained in the regular course of business. If called and sworn as a witness, I could and would competently testify to the statements made herein.

2. I was the Director of Operations at HireArt from March 28th, 2022, through June 30th, 2024. From July 1st 2024, until May 25th, 2025, I was a consultant for HireArt. From May 26th, 2025, through the present, I have been the Head of Human Resources for HireArt. In my role, I am familiar with HireArt's general business operations, including the process of onboarding employees.

3. HireArt operates a digital platform to match its customers' businesses with staffing needs, with a pool of short-term, seasonal, and temp-to-hire contract workers employed by HireArt nationwide. HireArt places employees in temporary and long-term assignments with its clients throughout the country. HireArt is incorporated in Delaware, with its principal place of business in New York.

4. HireArt also regularly uses interstate channels of communication, including email and interstate mail, and maintains a presence on the Internet through the HireArt website, where it advertises its products, services, and employment opportunities, and the HireArt Platform where job opportunities are posted.

5. In my capacity as Head of Human Resources, I am also familiar with HireArt's workforce and personnel record retention computer platforms. In addition, I was, and remain, intimately familiar with the personnel policies and practices of HireArt as it relates to implementation, distribution and acknowledgement of company policies through HireArt's web portal ("HireArt Portal"). I am a custodian of records for HireArt regarding the company's records, which are prepared and maintained in the ordinary course of

business. I am familiar with HireArt's electronic onboarding process for new hires, and have reviewed such information and records, including those pertaining to Plaintiff to provide the information contained herein. Documents are stored in the HireArt Portal, and are searchable based upon employee name and identification number.

6. HireArt's Portal allows its prospective employees to search for available job listings from any location with an internet connection and computer.

7. Plaintiff created his account on the HireArt Portal on or about February 22, 2024. HireArt's Client, SCALEAI, INC. ("SCALEAI") separately sourced Plaintiff and submitted Plaintiff's information to HireArt to initiate onboarding on or around February 22, 2024. Plaintiff was subsequently placed by HireArt with SCALEAI in an assignment beginning on or about February 26, 2024.

8. Plaintiff used the HireArt Platform to accept a contract work opportunity at HireArt's client SCALEAI, Inc. Plaintiff was offered positions as a RLHF Consultant, RLHF Code Expert, and AI Training Consultant at SCALEAI on or around February 22, 2024. Plaintiff began his onboarding process with HireArt on or around February 22, 2024. Plaintiff worked as an RLHF Consultant, RLHF Code Expert, and AI Training Consultant at SCALEAI from on or about February 26, 2024 until October 3, 2025. From on or about February 26, 2024 through October 3, 2025, Plaintiff was employed by HireArt Inc. HireArt's records indicate Plaintiff was "Converted to internal" by SCALEAI after October 3, 2025.

9. HireArt uses its own program, the HireArt Portal, to onboard its employees. Among other things, the HireArt Portal is an online portal accessible to HireArt's employees that provides them access to review, accept, and/or acknowledge agreements and policies at their convenience and from any location using the internet.

10. The HireArt Portal utilizes DropBox Sign (also known as HelloSign) which enables employees to electronically acknowledge and sign the various policies and agreements in the HireArt Portal.

11. At all times relevant, as part of the normal course of business, once an internal

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

HireArt recruiter identifies an applicant as "ready for hire," HireArt's human resources personnel approved the offer letter for the applicant in the HireArt Portal, which then automatically commenced the onboarding process. The HireArt Portal software sends HireArt employees an email to their personal email address employees provided to HireArt in the application phase, and the email contains a link to the HireArt platform where the employee can access their offer letter. A true and correct copy of a screenshot of the onboarding email that was sent from the HireArt Portal to Charles Wallace formerly known as Charles Lee Atchison to accept his offer for the assignment at SCALEAI and to initiate the onboarding process and that contains the weblink to an offer letter in the HireArt Portal is attached hereto as **Exhibit A**.

12. A true and correct copy of a screenshot of the HireArt Portal login page is attached hereto as **Exhibit B**.

13. Based on my review of HireArt's personnel records maintained in the ordinary course of business, I determined that Plaintiff provided his personal email address of cha911@g.harvard.edu. Plaintiff later updated his e-mail address on file to realcharleswallace@gmail.com. During the onboarding process, the HireArt Portal sent Plaintiff an onboarding email containing HireArt's offer letter to Plaintiff on or around February 22, 2024 to his cha911@g.harvard.edu e-mail.

14. By clicking on the application link in the job posting for an open position with HireArt or on the link to the offer letter in the candidate's invitation to onboard, HireArt employees are directed to the HireArt Portal, where employees, including Plaintiff, are prompted to set up an account that identifies each user through a unique username selected by the employee and a confidential password created by and known only to the employee. This unique username and password enabled the newly hired employee to access HireArt's HireArt Portal. A new employee could not access the HireArt Portal or complete the onboarding process without a unique username and password.

15. No one at HireArt can access an employee's password and there is no administrative backdoor for HireArt to learn the password, to sign into an employee's



LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

account, or to gain any access to or perform any action in an employee's account.

16. When each employee, including Plaintiff, logs onto the HireArt Portal the dashboard page loads for the specific employee profile. Upon the approval of an offer by HireArt Human Resources personnel, the onboarding process is initiated. As part of this onboarding process, HireArt employees are required to sign their offer letter to accept employment by clicking on a weblink to the HireArt portal and logging in to the employee's HireArt account. A true and correct copy of a screenshot reflecting the Offers webpage for Plaintiff on the HireArt Portal is attached hereto as **Exhibit C**.

17. At HireArt employees can access the HireArt Portal by either by signing on through a mobile device or using a computer. The HireArt Portal provides a mechanism for employees to sign onboarding documents and agreements using either a touch screen, such as a mobile device, iPad, or screen with touch capabilities; or by using a computer mouse to draw their signature.

18. Based upon the documents contained in Plaintiff's personnel records, which I have reviewed, Plaintiff logged into the HireArt Portal and signed his offer letter on February 22, 2024. A true and correct copy of a screenshot of Plaintiff's signature on his offer letter, which is maintained on the HireArt Portal, is attached as **Exhibit D**.

19. After signing the offer letter, an employee is able to review and acknowledge receipt of various digital onboarding documents and policies, including but not limited to, an I-9 verification form, payroll and benefits, the Employment Handbook, a Code of Business Ethics and Conduct policy, and HireArt's Employment & Arbitration Agreement, in the HireArt Portal. Plaintiff completed the process of onboarding on or around February 22, 2024.

20. Indeed, during the time period of February 26, 2024 through October 3, 2025, while HireArt employed Plaintiff to work with SCALEAI, HireArt employees received, and their employment was governed by, such policies, guidelines, and agreements, including the Employment & Arbitration Agreement. HireArt employees were permitted continuous access to these documents throughout their employment through the HireArt

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

Portal, including the ability to review their action items and previously completed actions in Dropbox Sign. Through the HireArt Portal onboarding process, employees could review the onboarding documents, and were prompted to click the hyperlink "Employment & Arbitration Agreement," which opened the Agreement in a web browser allowing the document to be viewed in its entirety and printed.

21. On February 22, 2024 Plaintiff logged into the HireArt Portal to review the Employment Agreement & Arbitration Agreement (the "Arbitration Agreement"). As part of the onboarding process, employees, like Plaintiff, are required to review and sign the Arbitration Agreement. On February 22, 2024, Plaintiff opened, reviewed, and digitally signed the Arbitration Agreement using a touch screen or computer mouse cursor. A true and correct copy of Plaintiff's signed Arbitration Agreement is attached hereto as **Exhibit E**.

22. Based upon the documents contained in Plaintiff's personnel records which I have reviewed, I confirm Plaintiff initially logged into the HireArt Portal on February 22, 2024 simultaneously creating his user account in the HireArt Portal. I confirm that on February 22, 2024, Plaintiff's unique username and password were used, and Plaintiff's signature provided, to complete and agree to the Arbitration Agreement. I confirm that Plaintiff completed the onboarding process in the HireArt Portal on February 22, 2024. A true and correct copy of a screenshot of the onboarding events timeline in the HireArt platform showing Plaintiff used his unique username and password to login HireArt Portal and electronically signed the Offer letter and Employment Documents on February 22, 2024 are attached hereto as **Exhibit F** A true and correct copy of a screenshot of the HireArt Portal reflecting Plaintiff's completion of the onboarding process is attached hereto as **Exhibit G**.

23. At all relevant times during his employment, Plaintiff had access to the Arbitration Agreement via the HireArt Portal, and could readily retrieve them at any time.

24. HireArt, Inc. updated its arbitration agreement on June 4, 2025. Both the employment and arbitration agreement Plaintiff agreed to and executed on February 22,

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

2024, and the June 4, 2025, version, required arbitration of covered claims.

25. Plaintiff was employed with HireArt, Inc. to work with SCALEAI, Inc. from on or around February 26, 2024, through October 3, 2025.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

Executed this 4th day of November 2026 at Austin, Texas.

_______________________________
MARIELLE WARDELL

LITTLER MENDELSON, P.C.
2049 Century Park East,
5th Floor
Los Angeles, California 90067.3107
310.553.0308

# EXHIBIT A

# Your Offer from HireArt!

Clicked Feb 22, 2024, 8:08:53 AM (CST)

Resend

From HireArt <support@hireart.com>

To cha911@g.harvard.edu

Subject Your Offer from HireArt!

Hi Charles,

**Congratulations!** We're excited to extend you an offer for the RLHF Consultant, Ground Truth Data Sets (Full-Time) role at Scale AI. As a HireArt employee, you will be employed by HireArt but working on-site at Scale AI. They partner with us because we provide them talented, driven people like you, and we're honored that we get to play a part in helping you grow your career.

Please click **here** to view and sign your offer.

Once you sign the offer letter, you'll be prompted to begin your onboarding process as a HireArt employee. Before you can begin at Scale AI, we'll need to:

- Gather payroll information so we can pay you
- Verify your eligibility to work in the United States

If you have any questions, please don't hesitate to ask.

Thank you and congratulations - we're excited to have you as part of our team!

-HireArt

HireArt

-------

For job updates and other news, follow us on: Twitter, Facebook, and LinkedIn

Ask the Agent

# EXHIBIT B

## Welcome to HireArt

Signed out successfully.

Sign in with Google

Email

Email

Email is required

Password

Password

Sign in

Remember me

Forgot your password?

# EXHIBIT C

Dashboard

JOB SEARCH

Applications

Interviews

**Offers**

EMPLOYMENT

Paystubs

Assignments

Personal information

Payment setup

Expenses

Documents

Benefits

GET HELP

Contact us



# Offers

| | Role | Company | Status | Actions |
|---|---|---|---|---|
| | RLHF Consultant, Ground Truth Data Sets (Full-Time) | Scale AI | Ready to work | View onboarding |

# EXHIBIT D

# Offer Letter

## Welcome to HireArt!

Congratulations. We're pleased to offer you the opportunity to work with HireArt ("HireArt Inc."). As a HireArt employee, you will be employed by HireArt but working with some of the most innovative technology companies in the country. They partner with us because we provide them talented, driven people like you, and we're honored that we get to play a part in helping you grow your career. Please review the below details of your employment and contact us if you have any questions.

| | |
|---|---|
| **Contract employer** | Scale AI |
| **Title** | RLHF Consultant, Ground Truth Data Sets (Full-Time) at Scale AI |
| **Offer date** | 2024-02-22 |
| **Pay rate** | $75.00 |
| **Benefits** | Commuter benefits<br>Life insurance & short-term disability coverage<br>401(k) |
| **Start date** | 2024-02-26 |

This offer of employment is contingent on a background check and satisfactory reference check.

## Sign offer letter

**Charles Atchison**

Signed: 22 February 2024 at 9:17 AM EST

# EXHIBIT E

# Employment agreement

**AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT**

As a condition of my employment with HireArt Inc., its subsidiaries, affiliates, successors or assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

1. At-Will Employment; Survival of Obligations.
   I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OF THE COMPANY. ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT ADVANCE NOTICE.

   I UNDERSTAND MY OBLIGATIONS TO THE COMPANY AS SET FORTH IN THIS AGREEMENT WILL SURVIVE AND REMAIN IN FULL FORCE AND EFFECT UPON THE TERMINATION OF MY EMPLOYMENT, BY EITHER PARTY, REGARDLESS OF THE DATE, CAUSE OR MANNER OF SUCH TERMINATION. AS USED IN THIS AGREEMENT, "TERMINATION DATE" MEANS THE EFFECTIVE DATE OF THE TERMINATION OF MY EMPLOYMENT FOR ANY REASON.

2. Confidential Information.
   A. Company Information.
      I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the President or the Board of Directors of the Company, any Company Confidential Information. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that "Company Confidential Information" means any non-public information that relates to the actual or anticipated business, research or development of the Company, or to the Company's technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances and other business information; provided, however Company Confidential Information does not include any of the foregoing items to the extent the same have become publicly known and made generally available through no wrongful act of mine or of others.

      I acknowledge that the Company Confidential Information is owned or licensed by the Company (or is possessed by the Company with its owner's permission); is unique, valuable, proprietary and confidential; derives independent actual or potential commercial value form not being generally known or available to the public; and is subject to reasonable measures to protect its confidentiality. I hereby relinquish and agree that I will not at any time claim any right, title or interest of any kind in or to any Company Confidential Information.

   B. Former Employer Information.
      I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or concurrent employer or other person or entity. I further agree that I will not bring onto the premises of the Company or transfer onto the Company's technology systems any unpublished document, proprietary information or trade secrets belonging to any such employer, person or entity unless consented to in writing by both Company and such employer, person or entity.

   C. Third Party Information.

I recognize that the Company may have received and in the future may receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("Associated Third Parties") their confidential or proprietary information ("Associated Third Party Confidential Information"). By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, to hold in the strictest confidence, and not to use or to disclose to any person, firm or corporation any Associated Third Party Confidential Information, except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information during my employment will lead to disciplinary action, up to and including immediate termination and legal action by the Company.

D. Required Disclosures.

Notwithstanding the covenants contained in Section 2A above, I acknowledge that I may disclose Company Confidential Information, solely to the extent that I am required to disclose such information by law, provided that prior to such disclosure I (i) notify the Company of the existence and terms of such obligation, (ii) give the Company a reasonable opportunity to seek a protective or similar order to prevent or limit such disclosure, and (iii) only disclose that information actually required to be disclosed.

E. Return of Company Confidential Information upon Termination.

Upon request during employment and immediately at the termination of my employment with the Company for any reason, I will return to the Company all Company Confidential Information in any form (including all copies and reproductions thereof) and all other property whatsoever of the Company in my possession or under my control. If requested by the Company, I will certify in writing that all such materials have been returned to the Company. Upon request by the Company, I will cooperate with the Company in transferring all logins, passwords, and other access information for accounts and systems previously used by me in connection with my employment with the Company. I also expressly agree that immediately upon the termination of my employment with the Company for any reason, I will cease using any secure website, computer systems, e-mail system, or phone system or voicemail service provided by the Company for the use of its employees.

F. Defend Trade Secrets Act.

I further acknowledge that nothing in this Agreement prohibits me from reporting an event that I reasonably and in good faith believe is a violation of law to the relevant law enforcement agency (such as the Securities and Exchange Commission, Equal Employment Opportunity Commission, or Department of Labor), or from cooperating in an investigation conducted by such a government agency. This provision hereby provides notice that under the 2016 Defend Trade Secrets Act (DTSA ): (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined under the DTSA) that: (A) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and, (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document contain the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

G. Statement On Lawful Reporting on Government Contracts

I further acknowledge that nothing in this Agreement prohibits me from lawfully reporting waste, fraud, or abuse related to the performance of a government contract to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information (e.g., agency Office of the Inspector General). Additionally, I acknowledge that I may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that I reasonably believe is evidence of: (1) Gross

mismanagement of a Federal contract or grant; (2) A gross waste of Federal funds; (3) An abuse of authority relating to a Federal contract or grant (defined as an arbitrary and capricious exercise of authority that is inconsistent with the mission of the executive agency concerned or the successful performance of a contract or grant of such agency); (4) A substantial and specific danger to public health or safety; or (5) A violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

Neither the confidentiality provision contained in the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, nor confidentiality provisions contained in any existing employment agreement or contract with the Company shall be construed to prohibit or otherwise restrict you, as an employee of the Company, from lawfully reporting waste, fraud, or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information under the procurement.

3. Inventions.
   A. Inventions Retained and Licensed.
   I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, and trade secrets, which were conceived in whole or in part by me prior to my employment with the Company to which I have any right, title or interest, and which relate to the Company's proposed business, products, or research and development ("Prior Inventions"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that the inclusion of any Prior Inventions from Exhibit A of this Agreement will not materially affect my ability to perform all obligations under this Agreement. If, in the course of my employment with the Company, I incorporate into or use in connection with any product, process, service, technology or other work by or on behalf of Company any Prior Invention, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license, with the right to grant and authorize sublicenses, to make, have made, modify, use, import, offer for sale, and sell such Prior Invention as part of or in connection with such product, process, service, technology or other work and to practice any method related thereto.

   B. Assignment of Inventions.
   If I use Company work resources or develop Inventions during work time, I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under patent, copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (including during my off duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information (collectively referred to as "Inventions"). I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

   I acknowledge that my obligations under this Section 3 will not apply to any Invention that I developed entirely on my own time without using the Company's equipment, supplies, facility or trade secret information, except for those Inventions that (i) relate to the Company's business or actual or demonstrably anticipated research or development, or (ii) result from any work performed by me for the Company. I will bear the burden of proof in establishing the applicability of this subsection to a particular circumstance.

   C. Maintenance of Records.
   I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the

form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. The records are and will be available to and remain the sole property of the Company at all times.

D. Patent and Copyright Registrations.
I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions and any rights relating thereto, and testifying in a suit or other proceeding relating to such Inventions and any rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature with respect to any Inventions including, without limitation, to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering such Inventions, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any papers, oaths and to do all other lawfully permitted acts with respect to such Inventions with the same legal force and effect as if executed by me.

4. Conflicting Employment.
   A. Current Obligations.
   I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

   B. Prior Relationships.
   Without limiting Section 4.A, I represent that I have no other agreements, relationships or commitments to any other person or entity that conflict with my obligations to the Company under this Agreement or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices and documents), I have returned all property and confidential information belonging to all prior employers. Moreover, in the event that the Company or any of its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor or successor corporations, or assigns ("Indemnitee") is sued based on any obligation or agreement to which I am a party or am bound, I agree to fully indemnify, defend, and hold harmless the Indemnitee for all verdicts, judgments, settlements, and other losses incurred by the Indemnitee in the event that it is the subject of any legal action resulting from any breach of my obligations under this Agreement, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action.

5. Worker Acknowledgment.
I acknowledge that I am an employee of Company and the Company may assign me to provide services to its Client. Consequently, the Company is the sole entity responsible for providing me any earned compensation and benefits. I will not be eligible to receive any kind of compensation or benefits from the Client. I will not be eligible to participate in any of the Client's employee-benefit plans, fringe-benefits plan, or any employee-bonus plan while I am an employee of the Company. I acknowledge Company, and not Client, shall provide workers' compensation and unemployment insurance benefits. I acknowledge I have received information from Company regarding terms of eligibility and ability to enroll in qualifying coverage under the Patient Protection and Affordable Care Act (the "Affordable Care Act"). Even though the Company is my employer, I agree to comply with all of the Company's and the Client's rules of conduct,

including but not limited to: anti-harassment, anti-discrimination and anti-retaliation policies, safety policies, drug and alcohol policies, other workplace policies and codes of business conduct, which policies and orientation will be timely provided by the Client or the Company. Because the Company is my employer, I acknowledge that I am required to report all job-related injuries or illnesses to the Company. I will also report all job-related injuries or illnesses to Client.

6. Notification of New Employer.
   In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

7. Solicitation of Employees.
   I agree that for a period of twelve (12) months immediately following the termination of my employment with the Company for any reason, whether voluntary or involuntary, with or without cause, I shall not either directly or indirectly solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, either for myself or for any other person or entity.

8. Representations.
   I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

9. Audit.
   I acknowledge that I have no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, or documents that are used to conduct the business of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized or non-compliant applications to the Company's technology systems and that I shall refrain from copying unlicensed software onto the Company's technology systems or using nonlicensed software or web sites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone and technology systems to which I will have access in connection with my employment.

10. Arbitration.
    A. Arbitration.

       If any legally-actionable dispute arises among me, the Company, and/or the Company's client to which I am assigned ("Client") regarding or relating to the services provided to Company or the Client or any aspect of this Agreement or my compensation, training, terms and/or conditions of my provision of the services, that cannot be resolved by mutual discussion, I agree that the dispute will be resolved through final and binding arbitration before an arbitrator. This agreement applies, but is not limited, to any claim I may make based on alleged joint employment or co-employment with Company or the Client. However, this Agreement does not apply to litigation pending in a state or federal court as of the date of my receipt of this Agreement, nor does it apply to any claim that may not be arbitrated as provided by an Act of Congress or lawful, enforceable Executive Order.

       My agreement pursuant to this Section includes any such disputes that the Company may have against me, as well as those that I may have against the Company and/or any of its employees, agents or Clients, arising out of or relating to the services.

       I acknowledge and agree that all disputes between me and the Company arising under or relating to this Agreement and the services provided hereunder shall be submitted to binding arbitration in accordance with the Employment Rules of Arbitration of the American Arbitration Association ("AAA") then in effect or any successor thereto and the substantive laws of the State of Delaware in effect at the time of the dispute. The arbitrator shall have the exclusive authority to decide gateway issues, including but not limited to arbitrability, waiver, and scope of coverage. If I and the Client and/or Company cannot mutually agree upon an arbitrator, we will use the selection process through the AAA.

       Unless applicable law requires otherwise, the Company or the Client shall pay for the costs of arbitration involving disputes under this Agreement. I agree to pay any filing fee with AAA that would have otherwise been required if

the dispute were filed in a court of competent jurisdiction.

The arbitration provided herein will be conducted in the state in which I reside, unless otherwise mutually agreed. The arbitrator shall be selected by mutual agreement. The arbitrator's decision and/or award shall be final and binding upon the Client and the Company. To the extent that a dispute is determined not to be arbitrable under this Section, the parties consent to the jurisdiction of the courts located in a mutually agreed upon location in the state in which I reside.

I further agree that arbitration shall be the exclusive and binding remedy for any such dispute and shall be used instead of any court action, which is hereby expressly waived. THE PARTIES EXPRESSLY WAIVE TRIAL BY JURY for all claims covered by this Agreement. All other rights, remedies, exhaustion requirements, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration with the exception of the claims identified in Section 10.C.. Notwithstanding the foregoing, nothing in this Agreement requires arbitration of any of the following: (a) any request by either party for temporary or preliminary injunctive relief to prevent irreparable harm pending arbitration in accordance with applicable law; (b) an administrative claim with an administrative agency; or (c) any class action claim or any other representative litigation. Nothing herein is intended to or shall preclude either party from filing a complaint and/or charge with any appropriate federal, state or local government agency and/or cooperating with said agency in its investigation. Nonetheless, the parties acknowledge that to the fullest extent permitted by law they shall not be entitled to receive any private relief, recovery, or monies in connection with any governmental complaint or charge, without regard as to who brought said complaint or charge. All monetary relief will only be available through arbitration.

Class Action Waiver: Company and I mutually agree that by entering into this agreement to arbitrate, both waive their right to have any dispute or claim brought, heard or arbitrated as a class action, collective action and/or representative action, and an arbitrator shall not have any authority to hear or arbitrate any class, collective or representative action ("Class Action Waiver"). Notwithstanding any other clause contained in this Agreement or the AAA Rules, any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, representative or private attorney general action and (2) there is a final judicial determination that all or part of the Class Action Waiver is unenforceable, the class, collective, representative and/or private attorney general action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

Opt Out: Arbitration is not a mandatory condition of my relationship with the Company, and therefore I may submit a statement notifying the Company that I wish to opt out and not be subject to this arbitration agreement. If I want to opt out, I must notify the Company of my intention to opt out by submitting a signed and dated statement on an "Arbitration Agreement Opt Out Form" that can be obtained from and returned to ([Fax] +1-646-893-5981) or by submitting a written notice to Company ([Fax] +1-646-893-5981) stating that I am opting out of this arbitration agreement. I also may opt out by sending an email to info@hireart.com stating my intention to opt out. In order to be effective, my opt out notice must be provided within 30 days of my receipt of this agreement. If I opt out as provided in this paragraph, I will not be subject to any adverse action as a consequence of that decision and may pursue available legal remedies without regard to this arbitration agreement. If I do not opt out within 30 days of your receipt of this agreement, continuing my relationship with the Company constitutes mutual acceptance of the terms of this arbitration agreement by me and the Company. I have the right to consult with counsel of my choice concerning this arbitration agreement.

Clients to which I am assigned, including "Client" named above, are intended third party beneficiaries of this arbitration agreement and may directly enforce it.

B. Procedure.

I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH AAA'S NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, MOTIONS TO DISMISS AND DEMURRERS, AND MOTIONS FOR CLASS CERTIFICATION, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY EXCEPT AS PROHIBITED BY LAW. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR AAA EXCEPT THAT I SHALL PAY THE FIRST $125.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION I INITIATE. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE AAA'S NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES CONFLICT WITH THE

RULES, THE RULES SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING. I AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN A MUTUALLY AGREED UPON LOCATION BY THE PARTIES IN THE STATE IN WHICH I RESIDE.

C. Restrictions
PURSUANT TO THE DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT 252.22-7006, THIS SECTION DOES NOT PERTAIN TO THE FOLLOWING DISPUTES: (A) ANY CLAIM UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; OR (B) ANY TORT RELATED TO OR ARISING OUT OF SEXUAL ASSAULT OR HARASSMENT, INCLUDING ASSAULT AND BATTERY, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, FALSE IMPRISONMENT, OR NEGLIGENT HIRING, SUPERVISION, OR RETENTION.

ADDITIONALLY, PURSUANT TO THE ENDING FORCED ARBITRATION OF SEXUAL ASSAULT AND SEXUAL HARASSMENT ACT OF 2021, THIS SECTION DOES NOT PERTAIN TO ANY ALLEGED CONDUCT CONSTITUTING A SEXUAL HARASSMENT DISPUTE OR SEXUAL ASSAULT DISPUTE (AS SUCH TERMS ARE DEFINED IN 9 U.S.C. § 401), NOR DOES IT APPLY TO THE NAME REPRESENTATIVE OF A CLASS OR IN A COLLECTIVE ACTION ALLEGING SUCH CONDUCT.

D. Remedy.
EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW. NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE UNDER THE RULES.

E. Administrative Relief.
I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

F. Voluntary Nature of Agreement.
I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT I AM WAIVING MY RIGHT TO A JURY TRIAL. FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

11. General Provisions.

A. Governing Law; Consent to Personal Jurisdiction.
This Agreement will be governed by the laws of the state of Delaware without giving effect to any choice of law rules or principles that may result in the application of the laws of any jurisdiction other than Delaware. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal jurisdiction of the state and federal courts located in the state in which I reside for any lawsuit filed against me by the Company.

B. Entire Agreement.
This Agreement, together with the Exhibits herein, sets forth the entire agreement and understanding between

the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the President of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

C. Severability.

If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

D. Successors and Assigns.

This Agreement will be binding upon my heirs, executors, assigns, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. There are no intended third party beneficiaries to this Agreement except as expressly stated.

E. Waiver.

Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

F. Survivorship.

The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

G. Signatures.

This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

## Sign employment agreement

Name

Charles Wallace

Signature



# EXHIBIT F

```
                              :job => "RLHF Consultant, Ground Truth Data Sets (Full-Time) at Scale AI",
                         :employer => "Scale AI",
                  :employment_type => "W2",
                 :enrollment_class => "Jobs::Onboarding::Enrollment::W2",
          :enrollment_completed_at => 2024-02-22 10:02:14.068408000 EST -05:00,
          :onboarding_completed_at => 2024-02-22 10:02:14.085948000 EST -05:00,
                  :offer_signed_at => 2024-02-22 09:17:11.620000000 EST -05:00,
             :offer_signature_name => "Charles Atchison",
             :employment_signed_at => 2024-02-22 09:19:14.816000000 EST -05:00,
        :employment_signature_name => "Charles Atchison",
              :federalw4_signed_at => 2024-02-22 09:41:24.000000000 EST -05:00,
                :statew4_signed_at => 2024-02-22 09:42:19.000000000 EST -05:00,
  :statew4_withholding_allowances => "6",
              :hellosign_documents => [
    [0] {
                :template => "Employee Handbook 2022",
               :signed_at => 2024-02-22 09:35:47.246637000 EST -05:00,
           :hellosign_req => "bc91d223a847a2a19ac6807d890b00e2ec781921"
    },
    [1] {
                :template => "Code of Business Ethics and Conduct 2022",
               :signed_at => 2024-02-22 09:25:10.166638000 EST -05:00,
           :hellosign_req => "eefdc1a9dadeb165f142d1c21f2fe589f610891d"
    },
    [2] {
                :template => "Scale Confidential Information and Invention Assignment Agreement",
               :signed_at => 2024-02-22 09:23:54.655258000 EST -05:00,
           :hellosign_req => "52007a064d4c3d95633b43a968d7d3e2f0b68ab2"
    },
    [3] {
                :template => "E-Verify Participation Poster and Right to Work Poster",
               :signed_at => 2024-02-22 09:20:45.948909000 EST -05:00,
           :hellosign_req => "42d2acae7bb82103d82a32d3ee94f56ec0bfee98"
```

# EXHIBIT G

HireArt

Charles Wallace

Dashboard

JOB SEARCH

Applications

Interviews

Offers

EMPLOYMENT

Paystubs

Assignments

Personal information

Payment setup

Expenses

Documents

Benefits

GET HELP

Contact us

Dashboard / Offers / Individual

OFFER INFORMATION

- Sign Offer Letter
- Sign Documents

BACKGROUND CHECK

- Rights & FCRA
- Disclosure
- Authorization

YOUR INFORMATION

- Contact Information
- Personal Information
- Emergency Contacts
- Federal W4 Form
- State W4 Form
- Payment Method
- Citizenship Status
- I-9 Documentation

REVIEW

- Review & Submit

## What's next?

Thank you for completing this stage of your onboarding.

You will also receive a separate email from WorkBright, our trusted partner for I-9 verification – please complete this step as soon as possible, as it is a required part of your onboarding.

Return Home